26        THE PEOPLE ex rel. STEBBINS v. HOE.

First Department, January Term, 1880.

THE PEOPLE OF THE STATE OF NEW YORK ex rel.
HENRY G. STEBBINS and others, Plaintiffs, v.
RICHARD M. HOE and others, Defendants.

*Rapid transit act — chap. 606 of 1875 — the commissioners appointed under can
organize but a single corporation.*

Commissioners appointed under the rapid transit act (chap. 606 of 1875), to
determine upon the necessity of a steam railway, and to fix and determine
"the route or routes for such steam railway or railways," have power to
organize but a single corporation to operate all the railways whose con-
struction they may authorize. They cannot organize a separate corporation to
operate each of such railways.

Controversy submitted upon agreed facts under section 1279
of the Code of Civil Procedure.

In the month of March, 1879, pursuant to the provisions of the
rapid transit act (chap. 606 of 1875), application in due form was
made to the mayor of the city of New York, by fifty reputable
house-holders and taxpayers of the city and county of New York,
for the appointment of five commissioners.

Within thirty days after the presentation of the said applica-
tion, the mayor duly appointed as such commissioners Messrs.
Henry F. Spaulding, Benjamin G. Arnold, Henry G. Stebbins,
Lewis G. Morris, and Samuel R. Filley, five of the relators in this
proceeding.

The said commissioners duly qualified as such according to the
provisions of the act, and within the time limited therefor met
and organized themselves as a board, with appropriate officers,
and by resolution duly adopted determined that there was a
necessity in the city and county of New York for a steam rail-
way or railways, for the transportation of passengers, etc., in
addition to any theretofore authorized or then existing.

They also, within the time for that purpose limited by the said
act, by resolution duly adopted, fixed and determined certain
routes of a steam railway or railways in the city of New York, as
follows :

First. A route to be designated as the Harlem River, Kings-
bridge and Riverdale Route.

Second. A route to be designated as the Central Route.

Third. A route to be designated as the East Side Route.

Fourth. A route to be designated as the Jerome Avenue Branch.

Fifth. A route to be designated as the Fordham Avenue Branch.

Sixth. A route to be designated as the Hunt's Point Route.

Seventh. A route to be designated as the Westchester Branch.

Eighth. A route for crossing the Harlem river.

Having, by due public notice, invited the submission of plans for the construction and operation of the railway or railways, the routes for which they had so determined, the said commissioners, on the 9th of July, 1879, at their office in the city of New York, met and decided upon the plans for the construction of such railways, and fixed and determined the time within which the several railways should be constructed and ready for operation, and also fixed and determined the amount of the capital stock of a company to be known by the name of the West Side and Yonkers Railway Company, to be formed for the purpose of constructing, maintaining and operating the railway or railways embraced in route number 1, as fixed and determined by them, and the number of shares into which such capital stock should be divided, etc. They also took the necessary steps to organize the said company which, immediately after it was so created, entered upon the construction of the railway embraced in the said route, designated by the said commissioners as the Harlem River, Kingsbridge and Riverdale route, and which is described in its articles of association.

After the said commissioners had fixed and determined the amount of the capital stock of the said West Side and Yonkers Railway Company, they further proceeded to fix and determine the amount of the capital stock of *another* company for the purpose of constructing, maintaining, and operating the railway or railways embraced in the routes determined by them, and designated respectively as the Central Route, the East Side Route, etc., said company to be known as the Suburban Rapid Transit Company, and proceeded to fix and determine the number of shares into which such capital stock should be divided, and the percent-

age thereof to be paid in cash. They also proposed to, and did prepare articles of association for the said proposed company, to be called the Suburban Rapid Transit Company, and caused a book of subscription to such capital stock of the company to be opened pursuant to notice.

Some subscriptions were made to the capital stock of the said proposed Suburban Rapid Transit Company, but the whole capital stock was not subscribed, nor was an amount of such capital stock, proportioned to the part of such railway or railways directed by said commissioners to be first constructed, subscribed; nor were subscriptions made thereto by as many as twenty-five persons. Among the persons who so subscribed was George H. Foster, one of the relators in this proceeding. The book of subscription for the capital stock for the proposed Suburban Rapid Transit Company still remains open.

In this state of facts, the question having arisen as to whether or not the said board of commissioners had, by the organization of the West Side and Yonkers Railway Company, exhausted their powers under the said act to organize a corporation, parties who were desirous of having the system of railways, which had been found by the said board to be necessary, completed, and who would otherwise have subscribed for the stock of a company duly organized to construct such railways, were deterred, by doubts as to the legality of the proceedings of the said relators, from making such subscriptions.

Thereupon, on the 31st of July, 1879, a *new* application by fifty householders and taxpayers for the appointment of commissioners, was duly presented to the mayor of the city of New York, from which it appeared that there was need in the city and county of a steam railway or railways. All the proposed railways embraced in the said application were wholly within the limits of the city and county of New York.

Within thirty days after the presentation to him of said application, the said mayor, pursuant to the provisions of the said act, duly appointed the defendants commissioners under the same, with full power and authority to do and provide all that commissioners under the act are directed to do and provide by the terms thereof.

The certificate of the appointment of said commissioners was

THE PEOPLE ex rel. STEBBINS v. HOE.            29

First Department, January Term, 1880.

duly executed and filed, and, within the time limited by the act for that purpose, the defendants respectively took and subscribed the necessary oath, and in all respects duly qualified as commissioners thereunder.

The defendants also, within the times in said act for said purposes respectively limited, met and organized as a board, and, by resolution, determined that there was a necessity in the city and county of New York for a steam railway or railways in addition to any then existing. They also, within the time limited by the act for that purpose, fixed and determined upon certain routes of steam railway in the city of New York, which are particularly set forth in the case.

These routes, so fixed and determined by the defendants, embraced in whole or in part the same routes fixed and determined under the same designation by the board of commissioners who appear as relators in this proceeding, and which were embraced in the articles of association prepared by the said relators for a corporation to be known as the Suburban Rapid Transit Company — the same company for subscription to the stock of which a book had been opened under the direction of the relators, and to the stock of which the relator, George H. Foster, had become a subscriber. The relators, deeming this action a usurpation of, and intrusion into, and an unlawful exercise of a public office, and of a franchise within this State, which should be restrained by the judgment of this court, called upon the attorney-general to intervene, pursuant to the provisions of section 432 of the Code.

There being no dispute about the facts, instead of an action being brought by the attorney-general pursuant to the provisions of section 432 of the Old Code, it was agreed that a case should be made for submission to the court, pursuant to the provisions of section 1279 of the Code of Civil Procedure, and under that arrangement the present submission was made.

The question presented was, briefly, whether, according to the true intent and meaning of chapter 606 of the Laws of 1875, a board of commissioners appointed under that act are limited to the organization of one corporation for the purpose of constructing, maintaining and operating a railway or railways upon the routes which they have fixed and determined; this being the

claim of the defendants ; or, whether a board of commissioners organized under said act, according to its true intent and meaning, have power to organize as many companies as they may think proper for the purpose of constructing, maintaining and operating a railway or railways upon the routes which they have fixed and determined ; this being the claim of the relators.

*Hamilton Ward* (attorney-general) and *George H. Foster* and *Samuel E. Lyon*, for the plaintiffs.

*William D. Shipman* and *Joseph Larocque*, for the defendants.

BARRETT, J. :

This case presents a very important question as to the powers of commissioners, appointed under what is commonly known as the rapid transit act.    (Laws of 1875, chap. 606.)

Under that act the commissioners, having first decided as to the necessity for steam transit in a particular locality, are required to fix and determine " the route or routes for such steam railway or railways."

The plaintiffs claim that these commissioners have the power to organize as many corporations as railways, while the defendants insist that they are limited to the formation of a single corporation.    The latter contention is certainly supported by the letter of the act.    The question is as to the intention.

There will probably be no difference of opinion as to the rules of construction.    The real intention, to be gleaned from the entire statute considered with reference to its reason and object, must always prevail over the literal sense of particular terms. To apply the words of Chief Justice CHURCH in the *Matter of the Gilbert Elevated Railway Co.* (70 N. Y., 371), the court should, " in furtherance of justice, adjudicate in favor of a practical rather than a literal construction of language ;" at the same time it is not the province of the court to correct legislative errors and omissions ; nor even supposed excesses, if they are within its constitutional power.    Where, then, the language used is explicit, the court must seek the intention in the words of the act.

The phraseology employed in the present instance plainly imports the uniting in a single corporation of all the railways

determined upon by the commissioners. When referring to corporate creation, it is the definite article and singular number which are used. The first allusion to a company is in the sixth section. It is in these words : "The said commissioners shall also, within the like period of ninety days after their organization, fix and determine the amount of the capital stock of *the company* to be formed for the purpose of constructing, maintaining and operating such railway *or railways.*"

Here we have "*the* company," in the singular, "the railways," in the plural ; not *a* company, not the company or *companies.*

From thence onward the same language is repeatedly employed. It pervades the entire act, with occasionally some expressive additions, evincing a spirit and intent quite in harmony with the letter. Of these we may profitably give a few examples. Thus, in section eight, we find this language : "Whenever the whole capital stock of *such company*, or an amount of such capital stock proportional to the part of such railway *or railways directed by said commissioners to be first constructed*, shall have been subscribed ;" and again : "A majority in number and amount of said subscribers may elect persons ＊ ＊ ＊ who shall be directors for one year of *the corporation* formed for the purpose of constructing and operating said railway or *railways.*"

So, in section 9, an affidavit is required from the directors that " it is intended in good faith to construct, maintain and operate the railway *or railways in such articles of association mentioned ;*" also, the filing of a certificate " in the office of the clerk of the county where such railway *or railways* shall be located."

Further on, when we come to the grant of power, it is said (§ 26, sub. 5) that every corporation formed under the act may · "construct, maintain, operate and use, in accordance with the plan adopted by said commissioners, a railway *or railways upon the route or routes and to the points decided upon*, and may secure the necessary foundations and erect the columns, piers and other structures which may be required to secure safety and stability in the construction and maintenance of *the railways constructed upon the plan adopted by the said commissioners and for operating the same.*"

All this, and particularly what we have quoted from the ninth

section, contemplates the embracing in *the company's articles of association*, of as many railways as the commissioners have "fixed and determined upon."

But what is quite as significant is the direction of the commissioners in the thirty-seventh section, " within one month after *such corporation* shall have been formed," to transfer and deliver to it " all plans, specifications, drawings, maps, books and papers in their possession." Also to pay over to the treasurer all money collected (from original subscribers to the stock), *after deducting therefrom the necessary expenses incurred by said commissioners, and the amount due or to accrue to them for their salaries.*"

These salaries are fixed by the thirty-eighth section at ten dollars per day to each commissioner, "*for each day of actual service, to be paid by such corporation.*"

These provisions certainly color the preceding sections, and deepen the conviction that but a single corporation was designed.

It is true, looking at it from the opposite standpoint, that the plans, specifications, etc., appertaining to *each* railway might be turned over to *each* appropriate corporation ; but what authority, it may be asked, have the commissioners to apportion their expenses and *per diem*, especially those incurred before even the incipient steps on the subject of corporate creation ?

The plaintiffs refer in support of their construction to the occasional use of such expressions as " any company," and " every corporation" formed under the act ; also, to the variation at times, especially when defining the power of such corporation, from the term " railway or railways " to the simple word " railroad." As to the latter, we think it quite clear that when the word railroad is used, it is in its ordinary meaning, that is, as generally applied to the great roads running through States. Not so, however, as to the word " railway or railways ;" the latter, when we consider the limited localities, and the general scope of the projects, seem to have been used rather as an extension or amplification of the words " route or routes," and not as characterizing distinct and independent railroads. Any break in the connection between the routes is thus provided for beyond question. For instance, parallel lines on neighboring avenues may or may not be connected by tracks laid upon side streets. When such connec-

tion is specified as part of the plan, it comes within the expression "the route of a railway," but when the parallel tracks are not intended to and do not connect, there may be said to be either two separate railways or two routes of one. The same reasoning implies to entirely independent routes, the difference being only in degree.

Thus the "*railroad*" is, in substance, the corporation working out the entire scheme of rapid transit. The "railroad" covers all the routes, all the tracks, all the railways; in fact, the totality of corporate rights and possessions.

The other expressions, "any company," "every corporation," etc., throw no light upon the precise question now before us. Many corporations may, of course, be formed under the act. There may be one in every county in the State. There may even be more than one, as we shall see hereafter, in any one county. These expressions undoubtedly have reference to any company properly organized in any county. To that and nothing else.

Having thus looked at the statute in its length and breadth we find nothing to justify the plaintiff's contention. There is, on the other hand, convincing proof of the correctness of the opposite view, not only in the plain language employed but in the complete and harmonious scheme which runs through the entire act. In this connection it may be well to consider the object of this legislation. The plaintiffs concede, what is undoubtedly the fact, that its chief purpose was to supply the city of New York with steam transit. The general railroad law was not adapted to secure this much desired end, and an entirely new system had to be planned.

The reason is obvious. The general railroad law was for the entire State. It could be set in motion, without consulting localities, by any twenty-five persons who chose to comply with its provisions. This would have been oppressive, unsuitable and indeed practically impossible of execution in limited and densely settled localities. The new system aimed at securing the desired end in a suitable and proper manner. It professed to throw many safeguards around the right of the public. In theory, at least, rapid transit is supposed to originate with the citizens themselves, for the law can only be set in motion by fifty reputable householders and tax-payers. Upon their application the commissioners

34     THE PEOPLE ex rel. STEBBINS v. HOE.

First Department, January Term, 1880.

are appointed by local authority. Nothing further can be done unless these commissioners determine that steam transit is needed. If they so determine they have exclusive power to locate the routes, to decide upon the plan and time of construction, to determine the maximum rates of fare, the hours during which special cars shall be run at reduced rates, and finally to organize "*the company.*" Up to this point the promoters of the enterprise have no statutory voice.

It will be observed that the entire programme must be settled upon and completed before the company is organized. After such organization the commissioners can fix no fresh route or routes, nor determine that any other railway is necessary. The intention here is clear and specific. It is to have all *the present needs* of any one locality debated, mapped out and satisfied, not by continuous acts but by one great, single and final exercise of judgment.

That the commissioners are thus limited is made additionally plain by the provision in the thirty-ninth section, that their terms of office expire " with the performance of their functions as herein prescribed." If continuous acts were authorized their tenure of office would necessarily be indefinite. Thus we have a scheme provided for one complete and comprehensive plan, covering all the ground and to be executed by a single corporate enterprise.

If the plan prove inadequate as a means of present relief, or if future need demand fresh action, the remedy is simple. The citizens, by a fresh application may again put the machinery of the act in motion. " *Whenever* it shall appear  *  *  * that there is need of a steam railway in any county," are the first words of the first section. It is the people, not the commissioners, who may proceed by continuous acts.

There is one further consideration which has been urgently pressed upon us and that is, that the law, as thus interpreted, would seem to exclude competition and sanction monopoly. Although our duty, as we have seen, is merely to ascertain and declare the legislative intent, yet we have given the argument on this head much reflection. It has, however, failed to convince us that the act, as we feel bound to construe it, is amenable to the plaintiff's criticism.

Where there are several routes, as to some of which there is a reasonable assurance of success and profit, while others in that regard are dubious, it would seem to be wise policy to include them all in one enterprise, compelling the construction and completion of all by the promoters, under some serious penalty. Subdividing the companies would insure the rapid completion of the better line ;˜while the doubtful route, equally necessary perhaps to a smaller class, would probably languish.

This very consideration seems to have been in the legislative mind, and it is covered by the seventh section, which gives the commissioners power to provide *in the company's articles of· association,* " for the release and forfeiture, of *all rights and franchises* acquired by *such corporation* in case such railway *or railways* shall not be completed within the time and upon the conditions therein provided."

We cannot agree to the construction placed upon this language by the learned counsel for the plaintiffs. It is contrary to the rules of interpretation for which they have contended throughout. To say that a corporation, which has been granted two or more lines; may, on the due and timely construction of one only, escape the penalty by pleading the completion of *a* railway, indicates that the letter of the section has alone been observed. We do not think that such a construction is even within the letter. The alternative — railway or railways — is plainly used to provide for either contingency ; that is, if but a single railway is authorized by the articles *that* must be completed under the penalty. If *railways* are so authorized, *they* must be completed under the penalty. Were this construction not within the letter, it certainly is within the spirit of the section.

The object was to compel conformity to the articles of association, as prepared by the commissioners, and to insure prompt construction of all the lines embraced therein. We have no doubt of the power of the commissioners in such a case to make ample provisions in the articles for a general forfeiture in a case of failure to complete each and every line granted to the corporation.

The result of an exceeding careful review of the entire subject is that the relator's power was exhausted upon the organization of the West Side and Yonkers Railway Company, and that the

defendants, appointed as commissioners under the second application, are alone authorized to form "the company" in question. There must, therefore, be judgment for the defendants.

DAVIS, P. J., and BRADY, J., concurred.

Judgment ordered for defendants.